# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ELBA POPPITI, on behalf of herself and all others similarly situated,<br><br>                      Plaintiff,<br><br>   v.<br><br>MILO ENTREPRISES INC d/b/a ASPECTEK,<br><br>                     Defendant. | **CASE NO.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Elba Poppiti ("Plaintiff"), by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge, against Defendant Milo Enterprises d/b/a Aspectek ("Defendant").

## NATURE OF THE ACTION

1.      This is a class action lawsuit on behalf of purchasers of Aspectek-brand ultrasonic and electromagnetic pest repellers (collectively, the "Repellers") in the United States.  The Repellers purport to repel "mice rat, cockroaches, ants, spiders, and more" from the home using ultrasonic and electromagnetic technology:



2.      Unfortunately for consumers, however, the Repellers are a complete sham. Decades of study and dozens of peer-reviewed tests have repeatedly and uniformly shown that ultrasound and electromagnetic technologies are incapable of repelling rodents and other pests in any real-world setting.

3.      There is only one reason anybody would ever purchase one of Defendant's Repellers.  That is because they have a pest problem and they wish to rid their house of the pests. But the Repellers will not do this.  They have no functional purpose whatsoever.  They are ineffective and worthless.

**PARTIES**

4.      Plaintiff Elba Poppiti is a citizen of New York who resides in the Bronx, New York.  Ms. Poppiti purchased an Aspectek Ultrasonic and Electromagnetic Pest Repeller from Walmart in Norwalk, CT, in the Summer of 2018 for approximately $15.  Prior to purchase, Ms. Poppiti carefully read the Repeller's labeling, including the characterization of the product as a "Pest Repeller."  Ms. Poppiti understood this to mean that the Pest Repeller would effectively

2

repel pests and reduce pest activity, and relied on in this representation in that she would not have purchased the Repeller at all, or would have only been willing to pay a substantially reduced price for the Repeller, had she known that the representation was false and misleading. Ms. Poppiti used the Repeller according to its instructions, but it was ineffective to repel pests.

5.      Defendant Milo Enterprises d/b/a Aspectek is a Vancouver, Canada corporation with a principal place of business in Blaine, WA.  Defendant distributes the Repellers throughout the United States.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

7.       Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

8.      All conditions precedent necessary for filing this Complaint have been satisfied and/or such conditions have been waived by the conduct of the Defendant.

## FACTS COMMON TO ALL CAUSES OF ACTION

A.      **List Of Repellers At Issue**

9.      The following Aspectek products use the ultrasonic and electromagnetic technology at issue in this case and are therefore included in the proposed class definition herein (collectively, the "Repellers"):

- *Trapest Ultrasonic Rodent and Insect Repeller* (ultrasonic)
- *Trapest 3-in-1 Repeller* (electromagnetic and ultrasonic)
- *Rotatable Ultrasonic Pest Control Repeller* (electromagnetic and ultrasonic)

- *Home Sentinel Indoor Pest Repeller* (electromagnetic and ultrasonic)
- *4-in-1 Indoor Electromagnetic Rodent Control* (electromagnetic and ultrasonic)

10.     Although the various Repellers have cosmetic differences, they are all alike in that they falsely promise to repel pests from the home and all use the same ineffective technology.

**B.     Decades Of Study And Dozens Of Peer Reviewed Experiments Show That Ultrasonic Technology Does Not Work**

11.     Entomologists have been examining the efficacy of ultrasonic devices for repelling and controlling rodents, as well as a host of other pests, for decades.  These tests uniformly show the same thing:  ultrasonic repellers do not work, period.  On the other hand, the number of peer-reviewed or otherwise credible tests concluding that such devices can be effective to date is zero.

12.     After reviewing the data, one textbook summarized that:  "[t]here are no indications that ultrasonic devices, as a single or long method, will control rodents, and regardless of the desire for a 'magic bullet,' ultrasonic devices are useless for the control of insect pests."[1]

13.      Often called the "bible of pest control," the *Mallis Handbook of Pest Control* states:  "Despite a history of 35 years of availability and use, the overwhelming majority of the professionals in the pest management industry on a global scale have failed to embrace ultrasonic devices, even as a supplement to conventional rodent control programs. Certainly, this reluctance cannot be written off as an oversight by on-the-job professionals."[2]

---

[1] Wood, F.E. 1986. Nonpesticidal components essential to pest management. pp.129-162. In *Advances in Urban Pest Management*. (G.W. Bennett and J.M. Owns ed.).

[2] Corrigan, R.C. 2011. Rats and Mice. pp. 11-149. In *Handbook of Pest Control* (10th edition). (S.A.Hedges ed.). Franzak & Foster, Cleveland, OH.

14.     To be sure, it is easy to see how people might have believed that the technology had potential once upon a time.  Rodents can hear ultrasound, and may even be very briefly disturbed by the soundwaves.  The problem is, however, that they very quickly become habituated to ultrasound, and begin to completely disregard it within hours of activating a device.

15.     That is why one peer-reviewed article concluded:

> "It is well established that such (ultrasonic) devices will not exterminate, kill, or drive rodents out of a favorable habitat. At best, they may temporarily discourage rodents from visiting areas in buildings that have little cover available… most rats and other rodents quickly become accustomed to any new sound, especially after it has been repeated long enough."[3]

Another peer-reviewed study found that:

> "None of the units produced anything more than a partial repellency for a day or so which was overcome, regardless of whether the frequency was variable, random, or intermittent."[4]

Another found that:

> "In our experiments, ultrasonics did not repel rats and mice from any of the tested areas… Eight years of evaluation of basic principles inherent to the use of acoustical frightening devices produced only negative results. None of the combinations tested will effectively extirpate rodents from a storage building by stimulating their receptors."[5]

Another found that:

> "Despite the wide range of decibel levels and frequencies evaluated, strong, sustained repellent effects were never detected…the six devices had insufficient repellency to merit any usefulness in rodent pest control applications, preventive or corrective"[6]

---

[3] Howard, W.E. and R.E. Marsh. 1985. Ultrasonics and electromagnetic control of rodents. Acta Zool. Fennica 173: 187-189.

[4] Meehan, A.P. 1984. *Rats and Mice: Their Biology and Control.* Rentokil Library Series: 383.

[5] Sprock, W.L., W.E. Howard, and F.C. Jacob. 1967. Sounds as a deterrent to rats and mice. Journal of Wildlife Management. 31: 729-741.

[6] Shumake, S.A. 1995. Electronic rodent repellent devices: a review of efficacy test protocols and regulatory actions. In *Repellents in Wildlife Management*. pp 253-270. USDA. Ft.

Another found that:

> "There have been so many failures reported with high-frequency
> sound that little can be said in favor of such devices."[7]

16.     There is no room for dispute on this issue.  Entomologists and other pest control experts have reached a consensus:  Ultrasonic devices simply do not work.

**C.     Even If Ultrasonic Technology Did Work, The Repellers Still Would Not Effectively Repel Rodents In Residences Or Any Other Real-Word Environment**

17.     From flat-earthers to alchemy enthusiasts, even debunked scientific theories can still have proponents.  However, even those who "believe" in the efficacy of ultrasonic devices would readily admit that, purely as a matter of physics, they cannot work in any residence or other real-world environment.

18.     As Dr. Michael F. Potter, a professor of Entomology at the University of Kentucky, has explained:  "Ultrasonic sound waves are highly directional, and are unable to penetrate or bend around solid objects such as cabinets, doors, furniture, appliances, walls, floors or ceilings. The waves are also rapidly absorbed by soft-textured materials such as cloth, paper, cardboard, and insulation. Consequently, they cannot reach cracks, crevices, voids, corners, and other protected places where most pests live (Koehler et. al 1986; Bomford and O'Brien 1990; Shumake 1995)."[8]

19.     But that is precisely why (among other reasons) the Repellers cannot work. Everybody's kitchens have cabinets.  All people's houses have furniture and beds.  These are realities of life.  A product that cannot work in the presence of these items cannot work in any

---

Collins, CO.

[7] Koehler, A.E., R.E. Marsh, and T.P. Salmon. 1990. Frightening methods and devices/stimuli to prevent mammal damage – a review. In *Proceedings of the 14th Vertebrate Pest Conference*. 168-173. Lincoln, NE.

[8] *See Hart v. BHH, LLC*, No. 135-9 at ¶ 16.

real person's house.  And in the best-case scenario, it would simply cause the pests to relocate to

other areas of the home, thereby exacerbating the problem rather than actually addressing it.

D. **Decades Of Study And Dozens Of Peer Reviewed Experiments Show That Electromagnetic Technology Does Not Work**

20. Electromagnetic technology is no more effective than ultrasonic technology at

repelling pests.  Decades of study have produced no reliable evidence whatsoever supporting its

use for this purpose.

21. In the late 1970s the United States Environmental Protection Agency

United States Environmental Protection Agency commissioned extensive studies of the

technology's effectiveness in repelling pests.[9]

22. As to rats, a study cited in the EPA's report found electromagnetic

technology "does not in any way live up to the distributor's claims" and was "ineffective

in producing mortality or in adversely altering feeding or other behavior."[10]

23. As to gophers, another of the Agency-commissioned studies found "no

indications of device efficacy."[11]

24. As to cockroaches, Dr. Potter explains that another such study found:

"No differences in avoidance or movement occurred when German cockroaches were exposed to any…electromagnetic devices.  The devices also had no effect on cockroach propagation or efficacy of insecticides.  Additionally, none of the three electromagnetic devices had any benefit in reducing cockroaches in infested apartments. Instead, populations doubled or tripled compared to when the devices were first installed 12 weeks earlier—the same level of increase in apartments where no treatment was performed… A similar lack of discernable effects on termites and flour beetles led the researchers to conclude that electromagnetic

---

[9] Reported in *U.S. EPA Investigation of Efficacy and Enforcement Activities Relating to Electromagnetic Pest Control Devices* (EPA 340/02-80-001) (1980).

[10] *Id.* at 98-103.

[11] *Id.* at 118.

devices probably would have negligible effect on other household insects as well."[12]

25.     The EPA investigation "resulted in fines to manufacturers for misbranding" and "established definitively that such devices have no effect on feeding, drinking, mating, or infestation patterns."[13]

E.       **History of FTC Warning Ultrasonic Pest Repeller Manufacturers**

26.     In May of 2001, the FTC sent warning letters to over 60 manufacturers and retailers of ultrasonic pest-control devices.  After investigation, the FTC found that many of the advertisements make explicit false claims about the products' ability to eliminate rodents or repel insects.  According to FTC staff, these types of claims may not be in compliance with the FTC Act, which prohibits false and deceptive advertising.

27.     From 1985 to 1997, the FTC brought actions against six companies that made false claims about the effectiveness of ultrasonic devices in controlling rodent and insect infestations.

28.     The types of claims challenged by the FTC included representations that ultrasonic devices can eliminate rodent infestations, repel insects, and serve as an effective alternative to conventional pest-control products, among others.

29.     Prior FTC complaints alleged that any reaction by rodents to ultrasonic sound would be temporary at best because rodents become accustomed to ultrasonic sound, and will return to their nesting or feeding areas even in the presence of an ultrasonic device.

---

[12] *Hart v. BHH, LLC*, No. 135-9 at ¶ 64, citing U.S. EPA Investigation of Efficacy and Enforcement Activities Relating to Electromagnetic Pest Control Devices (EPA 340/02-80-001) (1980).

[13] Shumake, S.A. 1995. Electronic rodent repellent devices: a review of efficacy test protocols and regulatory actions. In *Repellents in Wildlife Management*. pp 256. USDA. Ft. Collins, CO.

## CLASS REPRESENTATION ALLEGATIONS

30.     Ms. Poppiti seeks to represent a class defined as all persons in the United States who purchased the Repellers (the "Class"). Excluded from the Class are persons who made such purchase for purpose of resale.

31.     Ms. Poppiti also seeks to represent a subclass defined as all Class members who purchased the Repellers in Connecticut (the "Connecticut Subclass").

32.     Members of the Class and Connecticut Subclass are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class and Connecticut Subclass number in the millions. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

33.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to, whether Defendant's labeling, marketing and promotion of the Repellers is false and misleading.

34.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff was exposed to Defendant's false and misleading marketing and promotional materials and representations, purchased the Repellers, and suffered a loss as a result of that purchase.

35.     Plaintiff is an adequate representative of the Class and Connecticut Subclass because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she

intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

36.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

### COUNT I
**Deceptive Acts Or Practices, Connecticut Unfair Trade Practices Act § 42-110b**

37.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

38.     Plaintiff brings this claim individually and on behalf of members of the Connecticut Subclass against Defendant.

39.     By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices in the conduct of trade or commerce by making false representations on the packaging of the Repellers.

40.     The foregoing deceptive acts and practices were directed at consumers.

41.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the nature of the Repellers, specifically their ability to repel pests.

42.     Plaintiff and members of the Connecticut Subclass suffered and ascertainable loss of money or property as a result because (a) they would not have purchased the Repellers if they had known that the Repellers were ineffective to repel rodents, and (b) they overpaid for the Repellers on account of Defendant's misrepresentation that they are or could be used as "Pest Repellers."

43.     On behalf of herself and other members of the Connecticut Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages, punitive damages, and reasonable attorneys' fees.

## COUNT II

### Unjust Enrichment

44.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

45.     Plaintiff brings this claim individually and on behalf of members of the Class and Connecticut Subclass against Defendant.

46.     Plaintiff and Class members conferred benefits on Defendant by purchasing the Repellers.

47.     Defendant has knowledge of such benefits.

48.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class members' purchases of the Repellers.  Retention of those monies under these circumstances is unjust and inequitable because they are derived from Defendant's unlawful misrepresentations that they are or could be used as "Pest Repellers."

49.     Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class members for their unjust enrichment, as ordered by the Court.

## COUNT III
### Breach of Express Warranty

50.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

51.     Plaintiff brings this claim individually and on behalf of members of the Class and Connecticut Subclass against Defendant.

52.     In connection with the sale of the Repellers, Defendant, as the designer, manufacturer, marketer, distributor, and/or seller issued written warranties by representing that the Repellers are or could be used as "Pest Repellers."

53.     In fact, the Repellers do not conform to the above-referenced representation because the Repellers are ineffective.

54.     Plaintiff and Class members were injured as a direct and proximate result of Defendant's breach because (a) they would not have purchased the Repellers if they had known that the Repellers were ineffective to repel rodents, and (b) they overpaid for the Repellers on account of the misrepresentation that they are or could be used as Pest Repellers."

## COUNT IV
### Fraud

55.     Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

56.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Connecticut Subclass against Defendant.

57.     As discussed above, Defendant misrepresented on the Repellers' packaging that they are or could be used as "Pest Repellers."

58.     The false and misleading representation was made with knowledge of its falsehood.  Defendant is a top distributor of pest-repellant products in the United States who is undoubtedly aware of the studies finding that its products do not work and of the FTC investigation referenced above.  Nonetheless, Defendant continues to sell its ineffective and worthless Repellers to unsuspecting consumers.

59.     The false and misleading representations and omissions were made by Defendant, upon which Plaintiff and members of the proposed Class and Connecticut Subclass reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and members of the proposed Class and Connecticut Subclass to purchase the Repellers.

60.     The fraudulent actions of Defendant caused damage to Plaintiff and members of the proposed Class and Connecticut Subclass, who are entitled to damages and other legal and equitable relief as a result.

## COUNT V
### Magnuson-Moss Warranty Act

61.     Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

62.     Plaintiff brings this case individually and on behalf of the members of the proposed Class and Connecticut Subclass against Defendant.

63.     The Repellers are a consumer product as defined in 15 U.S.C. § 2301(1).

64.     Plaintiff and Class members are consumers as defined in 15 U.S.C. § 2301(3).

65.     Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

13

66.     In connection with the sale of the Repellers, Defendant issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that they are or could be used as "Pest Repellers."

67.     In fact, the Repellers are ineffective for their intended purpose of repelling pests.

68.     By reason of Defendant's breach of warranty, Defendant violated the statutory rights due to Plaintiff and Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq., thereby damaging Plaintiff and Class members.

69.     Plaintiff and Class members were injured as a direct and proximate result of Defendant's violation because (a) they would not have purchased the Repellers if they had known that they were ineffective for their stated purposes, and (b) they overpaid for the Repellers on account of the misrepresentations that they are or could be used as "Pest Repellers."

## RELIEF DEMANDED

70.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.     For an order certifying the nationwide Class and the Connecticut Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Connecticut Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Connecticut Subclass members;

b.     For an order declaring that Defendant's conduct violates the statutes referenced herein;

c.     For an order finding in favor of Plaintiff, the nationwide Class, and the Connecticut Subclass on all counts asserted herein;

d.     For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e.     For prejudgment interest on all amounts awarded;

f.     For an order of restitution and all other forms of equitable monetary relief;

14

g.    For an order enjoining Defendant from continuing the illegal practices detailed herein and compelling Defendant to undertake a corrective advertising campaign; and

h.    For an order awarding Plaintiff and the Class and Connecticut Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  October 31, 2019                          Respectfully submitted,


By:     /s/ James J. Reardon, Jr.
James J. Reardon, Jr. (ct13802)

**REARDON SCANLON LLP**
45 South Main St., 3rd Flr.
West Hartford, CT  06107
Tel:  (860) 955-9455
Fax: (860) 920-5242 (f)
E-Mail: james.reardon@reardonscanlon.com


**BURSOR & FISHER, P.A.**

By:   /s/ *Yitzchak Kopel*
          Yitzchak Kopel


Scott A. Bursor
Yitzchak Kopel
Andrew J. Obergfell
888 Seventh Avenue
Connecticut, NY 10019
Tel:  (646) 837-7150
Fax: (212) 989-9163
E-Mail:  scott@bursor.com
              ykopel@bursor.com
              aobergfell@bursor.com
              *Pro Hac Vice Forthcoming*


*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ELBA POPPITI, on behalf of herself and all others similarly situated, | **CASE NO.** |
| Plaintiff, | |
| v. | |
| MILO ENTREPRISES INC d/b/a ASPECTEK, | |
| Defendant. | |

A copy of this Class Action Complaint has been mailed or electronically mailed to the Connecticut Attorney General and the Commissioner of Consumer Protection.

/s/ James J. Reardon, Jr
James J. Reardon, Jr.

16